Gary A. Gotto (SBN 42272693)
KELLER ROHRBACK L.L.P.
3255 Bending Tree Ln
Missoula, MT 59808
Tel.: (406) 215-9100
Fax: (406) 623-3384
ggotto@kellerrohrback.com

*Additional attorneys appear on signature page*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| SHARON WENZE, | Case No.  CV-24-88-BU-BMM |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| SNOWFLAKE INC., | **JURY TRIAL DEMAND** |
| Defendant. | |

Plaintiff Sharon Wenze ("Plaintiff"), individually and on behalf of all persons similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Snowflake Inc. ("Snowflake" or "Defendant"). Plaintiff alleges the following based on personal knowledge, investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.    This action arises from Snowflake's failure to secure the personally identifiable information ("PII") of Plaintiff and the members of the proposed Class. Plaintiff and Class Members are customers, current and former employees, and others who provided their PII to Snowflake's clients—companies who use Snowflake's cloud-based data hosting platform to share and maintain customer data, including PII.

2.      Snowflake is a cloud storage service used by at least 9,822 customers,[1] including global industry-leading companies such as AT&T, Adobe, Kraft Heinz, Mastercard, Micron, Capital One, DoorDash, JetBlue, Instacart, Yamaha, HP, Nielsen, Novartis, PepsiCo, Siemens, NBC Universal, Advance Auto Parts, Ticketmaster, and Santander Bank, among many others.[2]

3.      Starting in mid-April 2024, a threat actor began using stolen Snowflake client credentials to access Snowflake client accounts and thereby acquire and exfiltrate the PII stored on Snowflake's platform (the "Data Breach").[3]

4.      Snowflake could have easily prevented the Data Breach by requiring all of its clients to (1) routinely change their passwords, (2) implement multifactor authentication, and (3) routinely monitor infostealer marketplaces for compromised credentials to prevent unauthorized access, among adopting other industry-standard best practices. Snowflake did not do so.

5.      Because Snowflake failed to implement adequate data security practices, the data stored in over 165 Snowflake client accounts, including the PII of hundreds of millions of individuals, was improperly accessed and exfiltrated by threat actors.[4] From just one Snowflake account, Ticketmaster, over 560 million customers records were compromised.[5]

---

[1] Snowflake Inc., *About Snowflake*, https://www.snowflake.com/en/company/overview/about-snowflake (last accessed Aug. 16, 2024).

[2] Jordan Novet, *AT&T's Massive Data Breach Deepens Crisis for Snowflake Seven Weeks After Hack Was Disclosed,* CNBC (July 15, 2024), https://www.cnbc.com/2024/07/12/snowflake-shares-slip-after-att-says-hackers-accessed-data.html (last accessed Aug. 16, 2024); Sergiu Gatlan, *Advance Auto Parts Stolen Data for Sale After Snowflake Attack*, BleepingComputer (June 5, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-stolen-data-for-sale-after-snowflake-attack (last accessed Aug. 16, 2024).

[3] Mandiant, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, Google Cloud Blog (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed Aug. 16, 2024).

[4] *Id.*

[5] Jonathan Greig, *Live Nation Confirms Ticketmaster Breach After Hackers Hawk Stolen Info of 560 Million,* Recorded Future News (June 3, 2024), https://therecord.media/live-nation-confirms-ticketmaster-breach-snowflake (last accessed Aug. 16, 2024).

6. The PII collected by Snowflake clients varies, but includes, *inter alia*, Social Security numbers, full names, dates of birth, email addresses, residential addresses, telephone numbers, driver's license numbers, financial account information, and other forms of PII.

7. After the threat actors exfiltrated the PII, they began advertising for sale large data sets of stolen PII, including samples of the PII at issue.[6]

8. Despite being responsible for maintaining the security of its cloud-based data services, Snowflake negligently failed to implement adequate data security measures to safeguard Plaintiff's and Class Members' PII within its possession. Snowflake's inadequate data security measures made the Data Breach a foreseeable consequence of its actions and omissions.

9. Plaintiff and Class Members now face an increased and impending risk of fraud, identity theft, and other forms of criminal wrongdoing—a risk they will face for years to come. As a result, Plaintiff and Class Members must spend significantly more time, energy, and money to protect themselves, as best as they can, from such crimes.

10. Plaintiff, on behalf of herself and the putative Class, brings claims for negligence, negligence per se, breach of third-party beneficiary contract, and declaratory judgment, seeking actual and putative damages, attorneys' fees, costs, expenses, and appropriate injunctive and declaratory relief.

## II.    PARTIES

11. Plaintiff Wenze is a resident and citizen of Texas, where she intends to remain.

12. Defendant Snowflake is a Delaware corporation with its headquarters and principal place of business located at 106 E. Babcock Street, Suite 3A, Bozeman, Montana 59715.

---

[6] Gatlan, *supra* note 2.

### III.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists under 28 U.S.C. § 1332(d)(2), as Snowflake is a citizen of a State different from that of at least one Class Member.

14.    This Court has personal jurisdiction over Snowflake because its headquarters and principal place of business are located in Bozeman, Montana.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Snowflake's principal place of business is located in this District, and the acts or omissions giving rise to Plaintiff's claims took place in this District.

### IV.    FACTUAL ALLEGATIONS

**A.    Snowflake Collects, Stores, and Profits from its Customers' Data, and Promises to Keep It Secure.**

16.    Snowflake is a cloud computing-based data company that allows its customers to store and analyze data on a single platform using its cloud-based hardware and software.[7]

17.    Snowflake offers its data cloud-based services to thousands of organizations across industries and regions, including major media, financial services, healthcare, technology, and telecom corporations, in addition to its public sector clients.[8]

---

[7] *See* Praneal Narayan, *What is the Snowflake Data Platform?*, SnapLogic (Mar. 21, 2024), https://www.snaplogic.com/blog/snowflake-data-platform (last accessed Aug. 16, 2024).

[8] *See* Snowflake Inc., *Leaders Choose Snowflake*, https://www.snowflake.com/en/customers/all-customers (last accessed Aug. 16, 2024).

18.    Snowflake is one of the largest data cloud platform providers on the market, commanding nearly 20% of the data hosting market share.[9]

19.    According to the company, Snowflake's "AI Data Cloud" is a "unified service used by nearly 10,000 companies to power their businesses with data, AI, and applications."[10]

20.    Since its inception, Snowflake has acquired more than a dozen companies "to foster innovation" and has opened over 45 corporate offices around the world.[11]

21.    As part of the data cloud services it offers to its customers, Snowflake is entrusted with the sensitive PII that its customers possess. Snowflake itself represents that, with respect to database storage, it "manages all aspects of how this data is stored—the organization, file size, structure, compression, metadata, statistics, and other aspects of data storage are handled by Snowflake."[12]

22.    As a leading cloud computing company, Snowflake touts that it "sets the standard for data security" and that it "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data."[13] Snowflake also represents that its "security architecture is complemented by the monitoring, alerts, controls, and processes that are part of Snowflake's comprehensive security framework."[14]

---

[9] Claude Mandy, *What We Know So Far About the Snowflake "Breach"*, Symmetry (June 11, 2024), https://www.symmetry-systems.com/blog/what-we-know-so-far-about-the-snowflake-breach (last accessed Aug. 16, 2024).

[10] Snowflake Inc., *Fast Facts*, (Apr. 30, 2024), https://www.snowflake.com/wp-content/uploads/2021/05/SnowflakeFastFactsSheet.pdf (last accessed Aug. 16, 2024).

[11] *Id.*

[12] Snowflake Inc., *Key Concepts & Architecture*, https://docs.snowflake.com/en/user-guide/intro-key-concepts (last accessed Aug. 16, 2024).

[13] Snowflake Inc., *Intro to Data Security*, https://www.snowflake.com/trending/intro-to-data-security (last accessed Aug. 16, 2024).

[14] *Id.*

23.    Publicly, Snowflake appreciates the importance of maintaining robust data security for its cloud computer customers: "In today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business."[15]

24.    Snowflake recommends a list of data security solutions for other companies to follow "to secure data and prevent breaches," including "Identity and access management" ("IAM").[16] IAM "includes the use of multifactor authentication" ("MFA") to "limit an organization's attack surface and the damage that can be done by an attack."[17]

25.    MFA is a multi-step electronic authentication login process that requires users to enter more than just a password to gain access to a website or an application.[18] For instance, along with a password, a user might be asked to input a single-use code sent to their mobile phone or email address or answer a secret question to gain access to their account.[19]

26.    In today's world, passwords "are simply not enough" as cybercriminals routinely search for passwords, and once they uncover one, they can potentially gain access to multiple accounts for which users may have reused the same password.[20] MFA adds an extra layer of security to prevent cybercriminals from accessing users' accounts, even when their passwords have been compromised.

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *See* Amazon Web Services, Inc., *What is Multi-Factor Authentication (MFA)?*, https://aws.amazon.com/what-is/mfa (last accessed Aug. 16, 2024).
[19] *Id.*
[20] *Id.*

27.     And although Snowflake "supports [MFA] to provide increased login security for users connecting to Snowflake," and indeed recommends using MFA, it neither required that its customers use MFA nor automatically enrolled its customers in MFA prior to the Data Breach.[21]

28.     Ultimately, despite attesting that its cloud computer platform maintained the security of its customers' data, those representations were unfounded, as shown by the Data Breach and the exfiltration of Plaintiff's and Class Members' sensitive PII.

**B.     The Snowflake Data Breach.**

29.     Beginning in April 2024, a cybercriminal threat actor group began a series of targeted attacks to infiltrate Snowflake's systems, in which the threat actors accessed and exfiltrated data from numerous Snowflake client accounts.[22] Because of the tremendous amount of exfiltrated data at issue in the Data Breach, the PII of hundreds of millions of individuals, including Plaintiff and Class Members, has been compromised.[23]

30.     On or about May 23, 2024, after becoming aware of unauthorized access to certain customer accounts, Snowflake began an investigation into the source of the unauthorized access.[24]

31.     As part of its investigation, Snowflake engaged third-party cybersecurity firm, Mandiant,[25] which subsequently "identified a threat campaign targeting Snowflake customer

---

[21] Snowflake Inc., *Multi-factor authentication (MFA)*, https://docs.snowflake.com/en/user-guide/security-mfa (last accessed Aug. 16, 2024).

[22] Mandiant, *supra* note 3.

[23] Matt Burgess, *The Snowflake Attack May Be Turning Into One of the Largest Data Breaches Ever*, Wired (June 6, 2024), https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree (last accessed Aug. 16, 2024).

[24] Brad Jones, *Detecting and Preventing Unauthorized User Access*, Snowflake (June 10, 2024), https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-user-access/8967 (last accessed Aug. 16, 2024).

[25] Zack Whittaker, *Mandiant Says Hackers Stole a "Significant Volume of Data" from Snowflake Customers*, TechCrunch (June 10, 2024), https://techcrunch.com/2024/06/10/mandiant-hackers-snowflake-stole-significant-volume-data-customers (last accessed Aug. 16, 2024).

database instances with the intent of data theft and extortion."[26] According to Mandiant, a financially motivated threat actor, UNC5537, was able to access Snowflake customer accounts by using stolen customer credentials to exfiltrate "a significant volume of customer data[.]"[27] After exfiltrating the data from Snowflake customer accounts, the threat actor began to advertise the data for sale on the dark web.

32.    To date, Mandiant and Snowflake have notified approximately 165 Snowflake clients that their customer data, including PII, has been potentially exposed in the Data Breach.[28]

33.    *Ticketmaster*. On May 23, 2024, Ticketmaster discovered that its customers' PII had been affected by the Data Breach.[29] Ticketmaster represented that the breach exposed customers' names, basic contact information, and other "extra" information.[30] Days later, a threat actor advertised the stolen data for sale on a hacking forum, asking for $500,000 USD in exchange for the PII of 560 million customers, including those individuals' full names, email addresses, phone numbers, residential addresses, and credit card details, among other customer information.[31] Ticketmaster was the first company to identify the connection of the exfiltration of its customers' data to Snowflake, confirming that its stolen database was hosted on Snowflake.[32]

---

[26] Mandiant, *supra* note 3.

[27] *Id.*

[28] *Id.*

[29] Lawrence Abrams, *Ticketmaster Sends Notifications About Recent Massive Data Breach*, BleepingComputer (June 28, 2024), https://www.bleepingcomputer.com/news/security/ticketmaster-sends-notifications-about-recent-massive-data-breach (last accessed Aug. 16, 2024).

[30] *Id.*

[31] *Id.*

[32] Zack Whittaker, *Live Nation Confirms Ticketmaster Was Hacked, Says Personal Information Stolen in Data Breach*, TechCrunch (May 31, 2024), https://techcrunch.com/2024/05/31/live-nation-confirms-ticketmaster-was-hacked-says-personal-information-stolen-in-data-breach (last accessed Aug. 16, 2024).

34.     *Advance Auto Parts*. On May 23, 2024, Advance Auto Parts discovered that an unauthorized third party exfiltrated information maintained by Advance Auto Parts between April and May 2024.[33] On June 4, 2024, a threat actor advertised PII collected by Advance Auto Parts for sale on a hacking forum, asking for $1.5 million USD in exchange for three terabytes of data.[34] The advertised stolen data included 380 million customer profiles (including full names, email addresses, phone numbers, and residential addresses) and other PII from customers, employees, and employment candidates (including Social Security Numbers, driver's license numbers, and other demographic details).[35] On June 14, 2024, Advance Auto Parts confirmed the breach through a Form 8-K filing and, after its own investigation, determined that the PII of 2.3 million current and former employees and job applicants was exposed in the Data Breach.[36]

35.     *Neiman Marcus*. On June 24, 2024, Neiman Marcus disclosed, in a breach notification with the Office of the Maine Attorney General, that the PII of nearly 65,000 of its customers was compromised in the Data Breach.[37] The types of PII affected included customers' names, contact information, date of birth, and other transaction data.[38] Neiman Marcus disclosed the data breach after a threat actor advertised the PII collected by Neiman Marcus for sale on a

---

[33] Lawrence Abrams, *Advance Auto Parts Confirms Data Breach Exposed Employee Information*, BleepingComputer (June 19, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-confirms-data-breach-exposed-employee-information (last accessed Aug. 16, 2024).

[34] *Id.*

[35] *Id.*

[36] Abrams, *supra* note 33; Bill Toulas, *Advance Auto Parts Data Breach Impacts 2.3 Million People,* BleepingComputer (July 11, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-data-breach-impacts-23-million-people/ (last accessed Aug. 16, 2024).

[37] *Data Breach Notification*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/f5f736b6-9f8e-4d3f-9d24-d5d14ab9d56f.html (last accessed Aug. 16, 2024).

[38] *Id.*

hacking forum, asking for $150,000 USD in exchange for 12 million gift card numbers, 70 million transactions with full customer details (including the last four digits of Social Security Numbers), and 6 billion rows of customer shopping records, store information, and employee data.[39] Separate reports have represented that more than 31 million Neiman Marcus email addresses were exposed in the Data Breach.[40]

36.    Many other Snowflake clients, including AT&T, Lending Tree, and others, have since confirmed that their customers' PII has been exposed.

37.    Mandiant's investigation found that the threat actor systematically compromised the PII collected by Snowflake clients by using stolen customer credentials, advertising victim data for sale on cybercrime forums, and then attempting to extort many of the victims.[41] Some customers' credentials were previously stolen via infostealer malware, which the threat actor then used to access and exfiltrate the Snowflake clients' PII.

38.    Mandiant's investigation explained that the coordinated attack against Snowflake was successful because: (1) "[t]he impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password"; (2) "[c]redentials identified in infostealer malware output were still valid, in some cases years after they were stolen, and had not been rotated or updated"; and (3) "[t]he impacted Snowflake customer instances did not have network allow lists in place to only allow access from trusted locations."[42]

---

[39] Sergiu Gatlan, *Neiman Marcus Data Breach: 31 Million Email Addresses Found Exposed*, BleepingComputer (July 8, 2024), https://www.bleepingcomputer.com/news/security/neiman-marcus-data-breach-31-million-email-addresses-found-exposed (last accessed Aug. 16, 2024).
[40] *Id.*
[41] Mandiant, *supra* note 3.
[42] *Id.*

39.     Snowflake's chief information security officer, Brad Jones, stated that the Data Breach was a "targeted campaign directed at users with single-factor authentication."[43] Multifactor authentication ("MFA") is an industry-wide best practice. Ofer Maor, co-founder at a cloud incident response firm, says that "MFA is a critical component in protecting against identity theft, and specifically against attacks related to the successful theft of passwords through phishing, malware (infostealers), or leakage of reused passwords from compromised sites."[44]

40.     As such, Snowflake could have easily prevented the Data Breach by requiring its clients to use MFA to adequately protect Plaintiff's and Class Members' PII. Snowflake did not choose to do so. Instead, Snowflake lets its clients decide whether to use MFA, and it does not enable MFA by default for its clients.[45]

41.     Jon Sternstein of Stern Security found it "surprising that the built-in account management within Snowflake doesn't have more robust capabilities like the ability to enforce MFA."[46] John Paul Cunningham, Chief Information Security Officer at Silverfort, explained that Snowflake's failure is "akin to someone picking the lock on your front door and giving them full access to everything in your house. By not using multifactor authentication (MFA) on their demo environment, and failing to disable the former employee's access, the Snowflake incident highlights a major gap in identity that companies continue to face."[47]

---

[43] Zach Whittaker, *What Snowflake Isn't Saying About its Customer Data Breaches*, TechCrunch (June 7, 2024), https://techcrunch.com/2024/06/07/snowflake-ticketmaster-lendingtree-customer-data-breach (last accessed Aug. 16, 2024).

[44] Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say*, Information Week (June 5, 2024), https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say (last accessed Aug. 16, 2024).

[45] *Id.*

[46] *Id.*

[47] *Id.*

42.    Now, after the fact, Snowflake says that is "developing a plan to require our customers to implement advanced security controls, like multifactor authentication[.]"[48] But the damage has already been done.

43.    Beyond their failure to require MFA for their clients' accounts, Snowflake could have avoided the Data Breach by mandating that clients regularly update their credentials and by monitoring the dark web and infostealer websites for compromised credentials, among other data security safeguards Snowflake could have employed to adequately protect Plaintiff's and Class Members' PII.

44.    Because of Snowflake's multiple data security failures, the Data Breach has compromised the PII of Plaintiff and Class Members, among millions of other victims, and the extent of their injuries is still unknown as more and more Snowflake client victims continue to come forward.

**C.    Snowflake Failed to Comply with Regulatory Guidance and Industry-Standard Cybersecurity Practices.**

45.    Snowflake's failure to properly safeguard its customers' data is attributable to its failure to comply with state and federal laws and requirements as well as industry standards governing the protection of PII.

46.    Federal and state regulators have set forth security standards and issued recommendations to prevent data breaches. As such, there are various state and federal laws, requirements, and industry standards governing the protection of PII.

47.    For example, at least 24 states have enacted laws addressing data security practices requiring businesses that own, license, or maintain PII to implement and maintain reasonable security procedures and practices and to protect PII from unauthorized access.

---

[48] Whittaker, *supra* note 43.

48.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses, highlighting the importance of adhering to reasonable data security practices.

49.     Snowflake failed to comply with FTC guidance on protecting PII and failed to follow industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Snowflake. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data.

50.     The FTC recommends:

- limiting access to customer information to employees who have a business reason to see it;

- keeping customer information in encrypted files to provide better protection in case of theft;

- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;

- monitoring both in- and out-bound transfers of information for indications of compromise, such as unexpectedly large amounts of data being transmitted to unknown users; and

- monitoring activity logs for signs of unauthorized access to customer information.[49]

---

[49] Fed. Trade Comm'n, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (Apr. 2006), https://web.archive.org/web/20220305192257/http://www.ftc.gov/tips-advice/business-center/guidance/financial-institutions-customer-information-complying (last accessed Aug. 16, 2024).

51.    The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.[50]

52.    In 2016, the FTC updated its publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[51] The guidelines note that businesses should protect the personal customer information that they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

53.    The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

54.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[50] Fed. Trade Comm'n, *Start With Security: A Guide for Business*, (June 2015), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Aug. 16, 2024).

[51] Fed. Trade Comm'n, *Protecting PII: A Guide for Business* (Oct. 2016), http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Aug. 16, 2024).

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

55.     The FTC has also interpreted Section 5 of the FTC Act to apply to failures to appropriately store and maintain personal data.

56.     Snowflake was aware of its obligations to protect the PII stored on its networks, yet failed to take reasonable steps to comply with such obligations. Snowflake was also aware of the significant repercussions if it failed to do so because its customers' data stored on Snowflake's contained PII from millions of consumers; Snowflake knew that this PII, if hacked, would result in injury to consumers, including Plaintiff and Class Members.

57.     Snowflake's (1) failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential and personal consumer data, and (2) its failure to verify that it had implemented reasonable security measures constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

58.     Further, various cybersecurity industry best practices have been published and should be consulted when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") established its Critical Security Controls ("CIS controls") that identify the most common cyber-attacks that impact businesses and offers solutions to defend against such attacks.[52] All organizations collecting and handling PII, including Snowflake, are strongly encouraged to follow the CIS controls.

---

[52] Center for Internet Security, *CIS Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last accessed Aug. 16, 2024).

59.     Certain best practices that should be implemented by data management companies such as Snowflake include, but are not limited to: (1) securely configuring business software; (2) managing access controls; (3) conducting continuous vulnerability management to networks, systems, and software; (4) maintaining network infrastructure; (5) providing network monitoring and defense; and (6) encrypting data.[53]

60.     Snowflake failed to follow these and other industry standards to properly protect Plaintiff's and Class Members' sensitive PII.

**D.     The Effect of the Data Breach on Plaintiff and Class Members.**

61.     Snowflake's failure to keep Plaintiff's and Class Members' PII secure has severe ongoing ramifications. Given the sensitive nature of the PII stolen in the Data Breach, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff and Class Members have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

62.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[54] "Identifying information" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[55]

63.     Identity thieves can use PII to commit a variety of crimes that harm victims, including obtaining a driver's license or identification card in the victim's name; using the victim's

---

[53] *Id.*
[54] 17 C.F.R. § 248.201(9).
[55] 17 C.F.R. § 248.201(8).

PII to obtain government benefits; filing a fraudulent tax return using the victim's PII to obtain a fraudulent refund; or immigration fraud.

64.    Merely reimbursing a victim for financial loss because of fraud does not make them whole. Conversely, identity theft victims have to spend many hours, and their own money, repairing their credit. For example, the Department of Justice determined that, in 2014, identity theft victims "reported spending an average of about 7 hours clearing up the issues" related to fraud.[56]

65.    Identity theft takes an emotional toll on its victims. According to a 2017 survey from the Identity Theft Resource Center, 75% of respondents expressed that they were severely distressed over the misuse or attempted misuse of their PII.[57] Identity theft victim respondents reported the following forms of emotional suffering: (i) 67% reported anxiety; (ii) 66% reported fear regarding their personal financial security; (iii) 44% reported the loss of ability to trust; (iv) 37% reported fear for financial security of family members; (v) 24% reported fear for their personal safety; and (vi) 7% reported feeling suicidal.[58]

66.    There are also often strong physical reactions associated with identity theft. In the same survey, respondents reported the following physician reactions: (i) 64% reported stress; (ii) 48% reported sleep disturbances; (iii) 37% reported an inability to concentrate or a lack of focus; (iv) 28% reported an inability to go to work because of these physician symptoms; and (v) 23%

---

[56] Bureau of Justice Statistics, *Victims of Identity Theft, 2014* at 10, U.S. Dep't of Just. (Nov. 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed Aug. 16, 2024).

[57] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017* at 10 (2017), https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last accessed Aug. 16, 2024).

[58] *Id.* at 11.

reported new physical illnesses (including aches and pains, heart palpitations, sweating, and stomach issues).[59]

67.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be the victim of several cybercrimes stemming from a single data breach.

68.    The U.S. Government Accountability Office determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that, "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[60] Moreover, there is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. Plaintiff and Class Members will therefore need to spend time and money to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them. Plaintiff and Class Members thus have been harmed in the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach. In other words, Plaintiff and Class Members have been harmed by the value of identity protection services they must purchase now, and in the future, to ameliorate the risk of harm they face due to the Data Breach.

69.    Plaintiff and Class Members now, and in the future, must confront constant surveillance and monitoring of their financial and personal records. Plaintiff and Class Members

---

[59] *Id.* at 12.
[60] U.S. Gov't Accountability Off., *GAO-07-737, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 4, 2007), https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last accessed Aug. 16, 2024).

incur and will continue to incur such damages, in addition to any fraudulent use of their PII and any emotional and/or physical suffering stemming therefrom.

**E.     The Snowflake Data Breach Injured Plaintiff and Class Members.**

70.     As a direct and proximate result of Snowflake's wrongful conduct and the Data Breach, Plaintiff and Class Members have been harmed by the fraudulent use of their PII and have been placed at an increased risk of additional harm from identity theft and identity fraud, requiring time, and money to mitigate the actual and potential impact of the Data Breach. Such mitigation efforts include, among others, placing "credit freezes" and "credit alerts" with reporting agencies, contacting financial institutions (and resulting closure or modification of related financial accounts), reviewing and monitoring creditor reports and accounts for any unauthorized activity, and closely reviewing phishing and/or spam communications now and for years to come.

71.     Snowflake's wrongful conduct directly and proximately caused the theft of Plaintiff's and Class Members' PII, leading to the following damages for which they are entitled to compensation: (i) theft and misuse of their PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII; (iii) loss of value of their PII, for which there is an established market; (iv) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (v) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach, including finding fraudulent charges, canceling and reissuing cards, purchasing credit monitoring and identity theft protection services, and the inconvenience and annoyance of confronting all such issues stemming from the Data Breach; and (vi) nominal damages.

72.     Plaintiff and Class Members have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages) that protects them from suffering further harm, as their PII remains in Snowflake's possession. Accordingly, this action

represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

**F.    Plaintiff Wenze's Experience**

73.    Plaintiff Sharon Wenze is a customer of AT&T. She provided her PII to AT&T and, in turn, to Snowflake, when purchasing products from AT&T. When providing AT&T with her PII, Plaintiff expected that her PII would be kept confidential.

74.    Upon information and belief, at the time of the Data Breach, Snowflake retained Plaintiff's PII in its system.

75.    On July 18, 2024, AT&T alerted Plaintiff that her PII—relating to her prior call interactions with other wireless phone numbers, including counts of those calls and total call durations—was compromised.

76.    Since the Data Breach, Plaintiff has spent numerous hours taking action to mitigate the impact of the Data Breach, including, but not limited to: (1) researching and verifying the legitimacy of the Data Breach; (2) monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect; and (3) changing her passwords after learning about the Data Breach. Plaintiff took these mitigation efforts and incurred this loss of time as a direct and proximate result of the Data Breach.

77.    After the Data Breach, Plaintiff experienced a significant increase in spam and/or phishing emails, requiring additional time to receive and review these communications.

78.    Because of the Data Breach, Plaintiff has suffered numerous, substantial injuries, including, but not limited to: (1) theft of her PII; (2) invasion of privacy; (3) lost or diminished value of PII; (4) lost time associated with attempting to mitigate the consequences of the Data Breach; and (5) imminent and impending injury arising from the increased risk of fraud and identity theft.

79.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

80.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and relief, remains in Snowflake's possession, is protected and safeguarded from future data breaches.

## V.    CLASS ACTION ALLEGATIONS

81.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Class"):

**All natural persons residing in the United States whose PII was exfiltrated in the Data Breach, including all those who were sent a notice of the Data Breach.**

82.    The Class asserts claims against Snowflake for negligence (Count One), negligence per se (Count Two), breach of third-party beneficiary contract (Count Three), and declaratory relief under the Declaratory Judgment Act (Count Four).

83.    Excluded from the Class are Snowflake, any entity in which Snowflake has a controlling interest, and Snowflake's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

84.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of their claims regarding liability and entitlement to injunctive relief and damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85.    Plaintiff reserves the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

86.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members in a single proceeding is impracticable. While the exact number of Class Members is unknown at this time, as noted above, it has been reported that hundreds of millions of individuals' information was compromised in the Data Breach.

87.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common questions include:

a.  Whether Snowflake engaged in the conduct alleged herein;

b.  Whether Snowflake had a duty to protect Plaintiff's and Class Members' PII from unauthorized access and disclosure;

c.  Whether Snowflake failed to take reasonable and prudent security measures to ensure its systems were protected;

d.  Whether Snowflake's computer and data storage systems, which were used to protect Plaintiff's and Class Members' PII, violated the FTC Act and/or Snowflake's other duties discussed herein;

e.  Whether Snowflake knew or should have known that its computer and data storage systems were vulnerable to compromise;

f.  Whether Snowflake's security measures to protect its systems were reasonable in light of known legal and regulatory requirements;

g.  Whether Snowflake's conduct constituted unfair or deceptive trade practices;

h.  Whether Snowflake unlawfully disclosed Plaintiff's and Class Members' PII;

i.  Which security procedures and notification procedures Snowflake should be required to implement;

j.  Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Snowflake's failure to reasonably protect their PII;

k.  Whether Snowflake should retain Plaintiff's and Class Members' valuable PII;

l.  Whether Snowflake failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

    m. Whether Snowflake breached duties to adequately protect Plaintiff's and Class Members' PII;

    n. Whether Snowflake's conduct resulted in or was the proximate cause of the loss of the PII of Plaintiff and Class Members;

    o. Whether Snowflake was negligent in failing to implement reasonable and adequate security procedures and practices;

    p. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

    q. Whether Plaintiff and Class Members are entitled to additional credit and/or identity theft monitoring; and

    r. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief.

88. Snowflake engaged in a common course of conduct giving rise to the claims advanced by Plaintiff on behalf of themself and all other Class Members. Individual questions, if any, are outnumbered by the overwhelming numerous common questions presented here.

89. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. On information and belief, Plaintiff's PII was in Snowflake's possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members, and Plaintiff seeks relief consistent with the relief of the Class.

90. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Snowflake to obtain relief for the Class. Plaintiff has no conflict of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data

breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

91.    **Predominance and Superiority: Federal Rule of Civil Procedure 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Snowflake, and thus, individual litigation to redress Snowflake's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

92.    **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Snowflake or would be dispositive of the interests of members of the proposed Class.

93.     **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Membership can be determined using Snowflake's records and/or information compromised in the Data Breach.

94.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Snowflake, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

95.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to: (i) whether Snowflake owed a legal duty to Plaintiff and Class Members to exercise due care in preventing unauthorized access to Snowflake's systems; (ii) whether Snowflake failed to adequately monitor its data security systems; and (iii) whether Snowflake failed to take reasonable steps to safeguard the PII of Plaintiff and Class Members.

## VI.     <u>CLAIMS FOR RELIEF</u>

### COUNT ONE — NEGLIGENCE

96.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

97.     Snowflake knew of the sensitive nature of Plaintiff's and Class Members' PII, along with the types of harm that Plaintiff and Class Members could and would suffer if their PII were wrongfully accessed and disclosed.

98.     Snowflake knew or reasonably should have known that the failure to exercise due care in storing Plaintiff's and Class Members' PII created an unreasonable risk of harm.

99.    Snowflake owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Snowflake's data security systems to ensure that Plaintiff's and Class Members' PII in Snowflake's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

100.    Snowflake's duty to use to use reasonable care arose from several sources, including but not limited to those described herein.

101.    Snowflake had common law duties to prevent foreseeable harm to Plaintiff and the Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by Snowflake's failure to protect their PII, because cybercriminals routinely attempt to steal such information and use it for nefarious purposes, but Snowflake also knew that it was more likely than not that Plaintiff and other Class Members would be harmed if it allowed such a breach.

102.    Snowflake's duty also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as Snowflake. Various FTC publications and data security breach orders further form the basis of Snowflake's duty.

103.    Snowflake breached the duties owed to Plaintiff and Class Members and thus was negligent. Snowflake breached these duties by, *inter alia*, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards during the period of the Data Breach; (d) comply with regulations regarding protecting the PII at issue during the period of the Data Breach; and (e) disclose in a timely and adequate manner that Plaintiff's and the Class Members' PII in Snowflake's possession had been, or was reasonably believed to have been, stolen or otherwise compromised.

104.    But for Snowflake's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

105.    Snowflake's failure to take proper security measures to protect the sensitive PII of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' PII.

106.    Plaintiff and Class Members were foreseeable victims of Snowflake's inadequate data security practices.

107.    As a direct and proximate result of Snowflake's negligence per se, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: (i) ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (ii) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (iii) loss of the value of their privacy and the confidentiality of the stolen PII; (iv) illegal sale of the compromised PII on the black market; (v) mitigation expenses and time

spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (vi) time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (vii) expenses and time spent initiating fraud alerts; (viii) decreased credit scores and ratings; (ix) lost work time; (x) lost value of PII; (xi) lost value of access to PII permitted by Snowflake; (xii) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (xiii) and other economic and non-economic harm.

108.    As a direct and proximate result of Snowflake's negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT TWO — NEGLIGENCE PER SE

109.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

110.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Snowflake of failing to use reasonable measures to protect PII.

111.    The FTC publications and orders also form the basis of Snowflake's duty.

112.    Snowflake violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Snowflake's conduct was particularly unreasonable given the nature and amount of PII it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving a company as large as Snowflake, including specifically the damages that would result to Plaintiff and Class Members.

113.    Snowflake's violation of Section 5 of the FTC Act constitutes negligence per se.

114.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

115.    The harm that has occurred is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and to avoid unfair and deceptive practices, caused similar harm as that suffered by Plaintiff and the Class.

116.    Snowflake breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

117.    Plaintiff and Class Members were foreseeable victims of Snowflake's violations of the FTC Act. Snowflake knew or should have known that its failure to implement reasonable measures to protect and secure Plaintiff's and Class Members' PII would cause damage to Plaintiff and Class Members.

118.    But for Snowflake's violation of the applicable laws and regulations, Plaintiff's and Class Members' PII would not have been accessed by unauthorized parties.

119.    As a direct and proximate result of Snowflake's negligence per se, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: (i) ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (ii) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (iii) loss of the value of their privacy and the confidentiality of the stolen PII; (iv) illegal sale of the compromised PII on the black market; (v) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (vi) time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (vii) expenses and time spent initiating fraud alerts;

(viii) decreased credit scores and ratings; (ix) lost work time; (x) lost value of PII; (xi) lost value of access to PII permitted by Snowflake; (xii) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (xiii) other economic and non-economic harm.

120.    As a direct and proximate result of Snowflake's negligence per se, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**COUNT THREE — BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**

121.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

122.    On information and belief, Snowflake executed contracts with its clients to provide data cloud-based data hosting services.

123.    In turn, Snowflake agreed to implement adequate data security measures to protect Plaintiff's and Class Members' PII and to adequately and timely notify them of the Data Breach.

124.    On information and belief, Plaintiff and Class Members were the intended third-party beneficiaries of the contracts executed between Snowflake and its clients because such contracts were made expressly for the benefit of Plaintiff and Class Members. Snowflake understood that, if it were to breach any contract, the client's underlying customers, including Plaintiff and Class Members, would be injured.

125.    Snowflake breached the contracts executed with its clients by, *inter alia*, failing to (i) adopt reasonable data security measures; (ii) implement sufficient protocols and employee training to adequately protect Plaintiff's and Class Members' sensitive PII from disclosure; and (iii) adequately and timely notify Plaintiff and Class Members of the Data Breach.

126.    Plaintiff and Class Members were harmed by Snowflake's breaches of contract, as alleged herein, and are entitled to the associated losses and damages they have suffered as a direct and proximate result.

## COUNT FOUR — DECLARATORY RELIEF UNDER THE DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201

127.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

128.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further relief as deemed necessary. The Court has broad authority to restrain acts that are tortious and violate the federal laws and regulations described herein.

129.    An actual controversy has arisen in the wake of the Data Breach regarding Snowflake's present and prospective common law and other duties to reasonably safeguard its customers' PII and whether Snowflake is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that future compromises of their PII will occur given the publicity around the Data Breach and the nature and quantity of the PII stored by Snowflake.

130.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      A.    Snowflake continues to owe a legal duty to secure Plaintiff's and Class Members' PII and to timely notify consumers of a data breach under the common law and Section 5 of the FTC Act; and

      B.    Snowflake continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

131.    The Court also should issue corresponding prospective injunctive relief requiring Snowflake to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

132.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Snowflake. The risk of another such breach is real, immediate, and substantial. If another breach at Snowflake occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

133.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Snowflake if an injunction is issued. Among other things, if another massive data breach occurs at Snowflake, Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Snowflake of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Snowflake has a pre-existing legal obligation to employ such measures.

134.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Snowflake, thus eliminating the additional injuries that would result to Plaintiff and Class Members and the millions of consumers if their confidential information were to be further compromised.

## VII.    PRAYER FOR RELIEF

135.    For these reasons, Plaintiff, individually and on behalf of members of the Class respectfully requests that the Court enter judgment in Plaintiff's favor and against Snowflake, as follows:

1.      Plaintiff respectfully requests that the Court enter judgment in Plaintiff's and Class Members' favor and against Snowflake as follows:

    i.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

    ii.    That the Court grant permanent injunctive relief to prohibit Snowflake from continuing to engage in the unlawful acts, omissions, and practices described herein, including:

    iii.    Prohibiting Snowflake from engaging in the wrongful and unlawful acts described herein;

    iv.    Requiring Snowflake to protect all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    v.    Requiring Snowflake to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

    vi.    That the Court awarding Plaintiff and the Class appropriate monetary relief, including compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

    vii.    That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

    viii.    That Plaintiff be granted the declaratory relief sought herein;

    ix.    That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

    x.    That the Court award pre-judgment and post-judgment interest at the maximum legal rate; and

    xi.    That the Court grant all such other relief as it deems just and proper.

## VIII.  <u>JURY DEMAND</u>

136.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: August 20, 2024.

KELLER ROHRBACK L.L.P.


By:  <u>*/s/ Gary A. Gotto*</u>
Gary A. Gotto (SBN 42272693)
3255 Bending Tree Ln
Missoula, MT 59808
Tel.: (406) 215-9100
Fax: (406) 623-3384
ggotto@kellerrohrback.com

Cari Campen Laufenberg (*pro hac vice* to follow)
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
claufenberg@kellerrohrback.com

***Attorney for Plaintiff and the Putative Class***